IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JOE MARCHIZZA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 11-3138 |
| | ) | |
| CIBER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

RICHARD MILLS, U.S. District Judge:

Pending before the Court is the Motion of Defendant Ciber, Inc. for Summary Judgment.

On June 17, 2010, Plaintiff Joe Marchizza was terminated from his position as the Area Director/Vice President ("area director") for the Springfield Branch of Ciber, Inc. ("Ciber"), an international provider of information technology services to public and private sector customers. At the time, Marchizza was 51 years old. Following his termination, Marchizza filed a Complaint pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq* ("ADEA"), claiming that he was

the victim of age discrimination.

Ciber asserts that Marchizza's position was no longer needed due to a reduction in force and company reorganization. It contends Marchizza was terminated for legitimate, non-discriminatory reasons and he is unable to show that but for his age, he would have remained employed by Ciber. Marchizza contends there are questions of fact which preclude the entry of summary judgment.

## I. FACTUAL BACKGROUND[1]

### A. Marchizza's employment with Ciber

In May 2010, Ciber North America was comprised of various divisions including but not limited to a Customs Solution Division, Federal Division, ITO Division and ERP Division. In its Customs Solution Division, Ciber had 36 branches each of which belonged to a division. Each

---

[1]In its Reply Brief, Ciber asks the Court to strike portions of the Declarations of Joe Marchizza and Ed Burns, his former supervisor, on the basis that some of the statements do not comply with the Federal Rules of Civil Procedure and/or Local Rule 7.1. The Court will only consider statements which are made on personal knowledge and are admissible in evidence and which show that the declarant is competent to testify on the matter at issue.

branch was managed by an area director who was responsible for all sales and reporting infrastructure in that location.

Just prior to his termination, Marchizza was the area director of Ciber's Springfield/Bloomington branch, which was part of the West/Plains region  reporting to Regional Vice President, Joe Mancuso.  Although Marchizza claims he reported to Mancuso at the time of his termination, it was Tony Hadzi, the Executive Vice President of Ciber's Customs Solution Division, who made the employment decision.  Hadzi had recently assumed supervisory responsibility over the Springfield/Bloomington branch because he wanted to be directly involved as to "the happenings with the State Farm account."  Prior to joining the West/Plains region in January or February 2010, Marchizza's Springfield/Bloomington branch was in Ciber's State & Local Division reporting to Ed Burns.  Burns was Marchizza's direct supervisor for the majority of his career with Ciber, as well as Ciber's predecessors.

In May 2010, the other branches that were part of the West/Plains region and their respective area directors, with ages in parenthesis, were:

Denver, Goodney Zap (51); Kansas City, Tim Van Wyngarden (42); NW Phoenix, Ron Noble (61); Phoenix, Dan Hoglund (55); San Francisco, Margaret Goetze (50); Seattle, Thomas Sundsboe (58); and St. Louis, Steve Egart (53).

In addition to the West/Plains Region, there was also the Midwest/Northeast Region, managed by Senior Vice President, Bill Hazelton (50); the Mid-Atlantic Region, managed by Regional Vice President, Ann Griffiths (54); and the South Region, managed by Senior Vice President, Tony Phillips (47). The respective branches and direct reports belonging to those regions were as follows:

a.   Midwest/Northeast: Boston, Heather Morris-Kyer (43); Detroit (Ford)/Cincinnati/Chicago, Dale Rinke (46); Detroit (UHG, Emerging Acct.), Mark Kurowski (46); Minnesota, Paul Cmiel (39); Philadelphia, John Morrisey (57); Pittsburgh, Christine Locklin (58); Providence, Tom Streicher (45); Rochester, NY, Dan Diefendorf (35).

b.   Mid-Atlantic: Harrisburg, Tom Saltzer (49); Law & Justice, John Bird (62); Tennessee, John Wood (42); Mississippi/Louisiana/Arkansas, Mark Hollingshead (39).

c.   South: Florida, Rich Schultz (52); Carolinas, Daniel Russell (49); Texas, Scott Youngman (44); Washington, D.C., Todd Kerr (47).

4

As the area director of Ciber's Springfield/Bloomington branch, Marchizza's duties were to manage the complete business at the branch level.  In that regard, Marchizza oversaw Ciber's Springfield, Bloomington and Indianapolis offices and was also responsible for Ciber's public sector work in Chicago.   Marchizza was "responsible for all customers in his branch," including the State Farm account.  Marchizza's largest customer from at least 2008 through the time he was terminated in 2010 was State Farm.  In 2008, State Farm generated $40,209,135.67 of the Springfield branch's $48,575,800.00 total generated revenue, or approximately 82% of the  branch's gross revenue.  In 2009, State Farm's revenue increased to approximately 86% of the Springfield branch's total revenue, accounting for $42,639,304.39 of the total generated revenue of $49,550,900.   The revenue generated by the State Farm account far exceeded the revenue generated by any other customer of the Springfield branch.  Marchizza acknowledged that State Farm generated the majority of the Springfield branch's revenue and his branch would not have been as successful without that account.  Overall, State Farm accounted for approximately four to five

5

percent of Ciber's total generated revenue.

Ciber primarily provided staffing services to State Farm for information technology positions. Specifically, Ciber provided State Farm with individuals, such as a programmer or an analyst (referred to as consultants), as requested on a contractual basis for a certain term. In 2008, Ciber was a primary preferred vendor for State Farm, which meant Ciber received new requisitions for new openings to fill a position first before the requisition was opened to other vendors. At least eight other companies held that same vendor status. Despite the profitability of State Farm, Marchizza was expected to diversify his client base. The risk an area director faces by not diversifying his or her client base and tying himself or herself to one client, is that "when that client goes, your job is at risk."

Ciber contends Joe Mancuso had at least two conversations with Marchizza during the time he supervised him about Marchizza's performance and the performance of the Springfield/Bloomington branch. He encouraged Marchizza to find new clients. In response to receiving the monthly profit and loss statements, Mancuso learned that Marchizza's

branch performance in 2009 and 2010 was "terrible" due to shrinking revenues, shrinking gross profit, shrinking net operating income, shrinking head count and shrinking client base.  The Springfield/Bloomington branch's generated revenue declined from $49,550,900 in 2009 to $29,580,000 in 2010, a decrease of approximately forty percent.  The revenue of Marchizza's branch was declining because of the "shrinking head count at State Farm and other clients," including the State of Illinois, IBM and the University of Illinois.  Marchizza disputes these facts, claiming that Mancuso communicated with him infrequently during the brief period he was Marchizza's supervisor.  Moreover, Mancuso had no involvement with the State Farm account and never discussed with Marchizza either his performance as Branch Manager or the performance of the Springfield Branch.

B. Ciber's loss of vendor status with State Farm

In the fall of 2009, Ciber lost its preferred vendor status with State Farm.  At the expiration of each master services agreement between Ciber and State Farm, State Farm would put out a request for proposal to update

and proceed with a new master services agreement that would allow Ciber to proceed as one of State Farm's primary preferred vendors.  In 2008, for example, Ciber responded to State Farm's request for proposal in order to "be put on a list of primary vendors that State Farm would align with and continue to grow with in to the future."  If Ciber was not selected in response to the request for proposal and was left off State Farm's preferred vendor list, Ciber would either run off its current purchase orders with State Farm or be requested by State Farm to transfer its employees immediately to a vendor who was selected to be included on State Farm's vendor list.  In the first scenario, Ciber's revenue generated from the State Farm account would decline slowly, eventually becoming zero when the purchase orders either expired or were terminated.  In the second scenario, the decline in Ciber's revenue would be more immediate because on a particular date, another vendor would assume Ciber's employees.  Marchizza notes that despite the loss of preferred vendor status, Ciber continued to do business with State Farm and remains today as one of Ciber's largest customers.

Gary Neumann, Ciber's delivery manager for the State Farm Account,

assisted with the preparation of Ciber's response to the 2008 request for proposal. In addition to presenting Ciber's response to the request for proposal to State Farm, Neumann also attended a meeting before submitting the response where State Farm indicated what it was interested in finding out from its vendors. Some of the key points were scalability and cost reduction. Despite that guidance, Ciber submitted rates in response to the request for proposal that were higher than in years past. Before Ciber's response to the request for proposal was provided to State Farm, Marchizza approved the rates, as well as the content of the response.

In the summer of 2009, State Farm communicated to Ciber that Ciber would no longer continue as a primary preferred vendor. Michael Miller, State Farm's Director of its External Sourcing Function, was involved in the decision to remove Ciber's vendor status. In the process of comparing existing preferred providers with new providers that State Farm had not done business with, Miller approved the recommendation to remove Ciber's vendor status for several reasons, including that Ciber's rates were not as competitive as other vendors. Miller testified:

9

A. Ciber was regarded as very similar to a couple other vendors we had in other words, you know, kind of vanilla ice cream, vanilla ice cream, vanilla ice cream.  We only needed one flavor of vanilla ice cream, and so we thinned our bench.
Q. Do you know what was wrong with Ciber's vanilla ice cream as compared to the others?
A. Their vanilla ice cream was too expensive.

John Allen, a Manager in State Farm's Systems Department within the External Sourcing Function, also did not recommend Ciber to continue on State Farm's vendor list because the vendors that were recommended were considered a better value.  In other words, "there were other vendors that were more competitive and provided a better value to State Farm Insurance."  Steve Moore, a purchasing representative at State Farm, told Neumann about the loss and indicated that Ciber's rates were high.  State Farm also told Mac Slingerlend, Ciber's former CEO, that Ciber's submitted pricing was high as compared to other submissions.  It was also communicated several times to Neumann and other Ciber representatives, including Marchizza, that State Farm's "current direction [was] to not grow with Ciber in the future."  In removing Ciber from its vendor list, it was State Farm's intention to phase out the relationship and reach a point

where State Farm would do no business with Ciber.  Marchizza responds by alleging that State Farm had no intention to discontinue doing business with Ciber and continues to this day using Ciber's services.

In addition to not being able to grow with State Farm in the future, Ciber's loss of its preferred vendor status meant that State Farm's utilization of Ciber as a vendor would decline because Ciber would no longer receive requisitions for new positions to add new consultants and Ciber was prohibited from backfilling positions.  Ultimately, Ciber's loss of its preferred vendor status would result in continued attrition of Ciber consultants servicing the State Farm account over time, as well as a significant decline in revenue.  The revenue generated by the State Farm account had declined by over fifty percent since 2008.

Likewise, the number of Ciber consultants placed at State Farm has declined, as well as State Farm's status as Ciber's largest customer in the Customs Solution Division.  In 2008 and 2009, State Farm was Ciber's largest customer in terms of generating the most revenue.  In 2010, State Farm dropped to Ciber's second largest customer and continued to decline

11

in 2011 to Ciber's fourth largest.  State Farm has continued to decline in the ranks and is currently Ciber's ninth largest customer.  Additionally, the number of Ciber consultants placed at State Farm has declined over the years–from 308 in 2008 to 155 in 2010 to 100 in 2012.

Although Ciber lost its preferred vendor status with State Farm, its master services agreement with State Farm was extended twice to allow Ciber to keep its current employees on contract.  Despite the extensions of the master services agreement, there has been no growth with the State Farm account and Ciber's business with State Farm has continued to shrink.

### C. Ciber's efforts to regain its business with State Farm

After Ciber heard it had lost its preferred vendor status with State Farm, efforts were made by several Ciber representatives to communicate to State Farm how Ciber could be a valuable vendor to State Farm in the future and determine whether Ciber could recoup any of its business.  As part of those efforts, in September 2009, Slingerlend called Hadzi and said, "We've lost the State Farm account.  Tony, can you see what you can do

to help understand why we lost it, what went on down there." In response to Slingerlend's request, Hadzi spoke with Burns, as well as Marchizza to understand and determine what had happened to cause Ciber to lose its preferred vendor status with State Farm. Marchizza and Burns told Hadzi that in addition to increasing Ciber's rates, they also did not include any solution options in the response to State Farm's request for proposal. Hadzi then sent Sree Kumar, Ciber's Vice President of its India Operations, and Ash Srivastava, one of Ciber's delivery leaders, to assist Marchizza and Burns with determining whether there was anything to present to State Farm to get them to reconsider their decisions. Marchizza alleges that he and Burns had earlier explored with State Farm Ciber's opportunity to do solution work for it and Ciber had been awarded a solutions project.

Thereafter in January 2010, Hadzi, Marchizza, Neumann and Srivastava met with Miller and Allen to see if State Farm would give Ciber an opportunity to rebid or find some other avenue for Ciber to work for State Farm again. Srivastava proceeded with the presentation to Miller and Allen during which he presented a managed-services type proposal that

13

highlighted Ciber's offshore experience and capability, as well as its plans for the future.

Although Miller and Allen stated they were very impressed with Ciber's presentation, they advised the Ciber team that the presentation did not change their minds and their decision remained.  Miller clarified that as turnover occurred with Ciber consultants the individual would be replaced by one of the preferred vendors' employees.  After that meeting, it was Hadzi's understanding that Ciber could not increase or continue its business with State Farm and Ciber would no longer be providing services to State Farm in the foreseeable future.  After the January 2010 meeting, additional attempts were made to try and get State Farm to reconsider its position of discontinuing its relationship with Ciber. Ciber asserts that despite those attempts, State Farm adhered to its decision to exclude Ciber from its vendor list and not grow with Ciber in the future. Marchizza contends State Farm did intend to continue to use Ciber to provide services to State Farm.  Moreover, State Farm remained one of Ciber's ten largest customers at least through 2012.

Ciber alleges Hadzi was unable to accurately identify a timeline for when Ciber would no longer have any business with State Farm.  Thus, Hadzi was "playing blind" in that he was unaware of what was going to happen with the account in the foreseeable future.  For example, it was unclear whether State Farm would remove all of the Ciber consultants, transfer them to one of its preferred vendors or maintain them onsite. Given these possibilities, Hadzi tried to retain and conserve resources to minimize costs.  Marchizza disputes the allegation, noting that as it had in the past, State Farm in 2009 signed an agreement with Ciber to continue their business relationship.  It never discontinued using Ciber's services.

### D. Ciber's plans to transform its Custom Solution Division

Around the time Ciber exhausted its efforts with State Farm, Ciber was solidifying its plans to reorganize and transform its Customs Solution Division.  In 2003 and 2004, the landscape of the information technology solutions industry changed.   Ciber's competitors started using global delivery models to deliver solutions, building teams and models for a customer rather than placing people on site through staffing.  Accordingly,

Ciber claims the staffing work became non-competitive.  However, Ciber "missed the boat" in offering its client based solution options as it predominately started off as a staffing company.  Marchizza disputes Ciber's assertion that the staffing work became non-competitive.  Many of Ciber's competitors were larger and better equipped to provide information technology services to customers from off-shore locations.  Nevertheless, Ciber's business relationship with State Farm continued.  State Farm remains one of Ciber's largest customers.

As a response to the changing landscape of its industry and in an effort to make Ciber more competitive, midway through 2009, Ciber started transitioning its Customs Solution Division from a branch model to a project delivery model.  In September 2009, Slingerlend promoted Hadzi to the position of Executive Vice President of the Customs Solution Division and tasked Hadzi with globalizing the division.  Through his efforts, Hadzi discovered that the branch model was flawed and the branches could not fit into a global delivery model.  Hadzi then mapped out the way Ciber's competition was structured and created a blueprint for

16

Ciber's board of directors and Slingerlend demonstrating the flaws of the branch model and how Ciber needed to move to a three-silo model in order to survive in the current market: delivery, sales, and administration.   In other words, the goal of this transition was to completely eliminate the 36 branches in favor of a sales/delivery/administrative model.  Consultants no longer would be identified by branch, but instead classified by skill set and placed in practices under the leadership of a practice leader, which would result in the elimination of the area director position, among others, in favor of markets versus geographical locations.  As part of this transition, Ciber would also move away from staffing projects to delivery of project services and outsourcing for large new customers.  Marchizza states that Ciber did continue to seek out consulting work.

In March 2010, Ciber's board of directors adopted Hadzi's proposal to eliminate the branches and hired a new CEO in July 2010.  David Plisko, Ciber's Vice President of Employee Services, learned about the transformation of the Customs Solution Division during the fall of 2010 because he was tasked with redesigning Ciber's systems on how to track and

classify its employees.  Plisko also assisted with classifying employees in new job titles and organizing delivery leaders to assist with classifying consultants per the consultants' technical specifications.  Marchizza alleges Plisko's classification work dealt only with consultants.

During a meeting with all the area directors in March or April 2010, Hadzi informed the area directors that Ciber was doing away with the branch model and moving to a new delivery and account management model that would result in a complete metamorphosis of the business. Hadzi informed the area directors that he, along with his executive team, would try and transition the area directors into new positions within the new model, but some individuals would be let go in the process.  January 1, 2011 was the target date for Ciber to completely eliminate the area director position, as well as the branches, but the process of terminating branch area directors began in 2010.

After Slingerlend left and before the new CEO was hired, Hadzi along with Bill Hazleton, Ciber's then Senior Vice President, and Mancuso started to assess who should be dismissed or retained as part of the

restructure of the Customs Solution Division.   Hadzi, Hazleton and Mancuso looked at several factors, including the ability to lead teams of sales people in multiple markets, who brought in which accounts to the company, how much business continued to be brought in to the company, the capability of bringing in and selling large projects, and the ability to open new accounts and perform service oriented work and outsourcing. They looked at these factors and compared them against an individual's past performance, ability to lead and ability to sell to determine whether the individual should be considered to assume a sales, administrative or delivery position or be separated from Ciber.   Marchizza disputes these allegations, stating that Mancuso informed him that he was not involved in the termination decision.  Moreover, Marchizza asserts Hadzi, Mancuso and Hazelton were not familiar with either Marchizza or the Springfield Branch and were incapable of evaluating him.

In looking for area directors to assume delivery responsibilities, Hadzi primarily looked for individuals who had engineering backgrounds and an understanding of and experience with global delivery. Only four former area

19

directors transitioned to a delivery role.  The rest were hired externally.

For administrative functions, Hadzi looked for individuals with skills and backgrounds in Human Resources, familiarity with recruiting across the country and in India, and an understanding of how to mix and blend resources.  Two area directors transitioned to an administrative role.  For example, Scott Youngman (44), a former area director, assumed an administrative role because of his background at IBM in Global Services.

Approximately seven area directors assumed sales responsibilities under the new model.  In looking for individuals for these positions, there were many factors taken into account, including experience in bringing in new accounts, the way a customer was approached, the types of accounts brought into Ciber and, overall, whether the individual was a good account advocate and fostered good relationships with customers.   Marchizza contends that Hadzi, Mancuso and Hazelton were not able to properly assess him.

Ciber alleges Hadzi determined that Marchizza did not fit into the Customs Solution Division's new model because he was a staffing guy,

which was his forte, as admitted by Burns, Marchizza's supervisor for most of his career, as well as Slingerlend. This was demonstrated by the fact that throughout Marchizza's career with Ciber, he only had one account, State Farm, and a few outlying contracts that were relatively small. Moreover, the State Farm account failed to progress beyond staffing, which was work that Ciber ultimately no longer sought out as the Customs Solution Division transitioned into the new model. Marchizza disputes the allegation and states that in 2010, the Springfield Branch had been providing solution services and was actively seeking out new solution work.

Ciber further alleges Mancuso agreed that Marchizza should not be recommended for any of the new roles in the Customs Solution Division. Based on Mancuso's knowledge of Marchizza's capabilities, and the results of his operation per the financials, Mancuso determined that Marchizza was unable to sell, build a client base, reduce the revenue deficit and lead a branch. Marchizza disputes the assertion, claiming that Mancuso supervised him for only six months during which time they communicated infrequently.

E. Marchizza's termination

On June 17, 2010, Marchizza's employment was terminated.  Hadzi ultimately decided to terminate Marchizza's employment for business reasons, though Ciber alleges Mancuso concurred in the decision. Marchizza states Mancuso told him that he had no role in the employment decision, which was made by Hadzi.  Ciber's asserted justification was that Marchizza lost the preferred vendor status for his primary account, while it was his ultimate responsibility to maintain and grow that account.  Hadzi determined that Marchizza's position had become obsolete because Neumann could manage the account going forward at much less of a cost to Ciber.  Moreover, at the time of the decision, Ciber had started to transition away from the branch model to larger market based leaders and there was no place for Marchizza in the transition.  Based on the foregoing, Ciber asserts that Hadzi saw no benefit in continuing Marchizza's empoloyment.

Marchizza disputes a number of allegations in the preceding paragraph.  First, Ciber was removed from preferred provider status because

22

its rates were not as competitive as other vendors.  Moreover, Ciber was replaced in its primary preferred status with State Farm in favor of significantly larger vendors with much larger offshore capabilities.  In June of 2009, moreover, State Farm had no intention of terminating its relationship with Ciber and planned to continue the relationship. Marchizza claims an amendment to the master services agreement was signed by State Farm and Ciber in June of 2009, which amended the rates and extended the agreement to December 31, 2011.  The master services agreement was later extended to December 13, 2013.  Thus, Ciber's business relationship with State Farm continues to the present point in time.  Finally, Marchizza asserts the process of considering branch managers for other positions began at Ciber in early 2010.  Marchizza was not considered for other positions in Ciber.

Before proceeding with Marchizza's termination, Hadzi met with Mancuso, Plisko and Srivastava concerning the decision to end Marchizza's employment.  Ciber alleges the group discussed the unsuccessful attempts made to resuscitate the State Farm account and how, despite those efforts,

23

Ciber's business with that account could not be saved.  Hadzi also addressed the impending transition within Ciber's Customs Solution Division to move toward larger market based leaders and large project service oriented, outsourcing work and away from the local geographic managers and the staffing business.  Ciber asserts that based on the reorganization and the continued decline in the business at State Farm, Hadzi explained there was no longer a need for Marchizza.  The group concurred with Hadzi's decision to proceed with Marchizza's termination.  Marchizza disputes some of these allegations, claiming there was no discussion of the State Farm account at the meeting.

After Slingerlend received word of Marchizza's termination, he tried to "undo what was being done."  Slingerlend contacted Paul Jacobs (70), Ciber's new chairman of the Board of Directors, and told him that he thought it was wrong for Ciber to terminate Marchizza.  Slingerlend also sent Paul Jacobs an email on June 15, 2010, titled "Joe Marchizza made Ciber."  Jacobs proceeded to forward Slingerlend's email to Peter Cheesbrough (58), Ciber's interim CEO at the time, indicating that

Slingerlend had "a different view of JM's value."  Cheesebrough responded to Jacobs' email after speaking with Mancuso about the matter and stating he was "comfortable proceeding as planned."   Jacobs responded to Cheesbrough stating he had "no concerns," and thanked him for following up.

Hadzi and Plisko met with Marchizza on June 17, 2010 to advise him of his termination.  Ciber alleges Hadzi explained to Marchizza that they had done all they could with regard to State Farm, but the account was not recoverable and Ciber was making some changes to the company's direction.  Marchizza reiterates that State Farm was not discussed at the meeting.  Hadzi further stated that Marchizza's position as the area director of the Springfield Branch was being eliminated, thanked him for his efforts, and noted that Marchizza was not the only area director that was going to have to be terminated.  Hadzi then proceeded to exit the room and Plisko spent some time with Marchizza discussing his benefits and the logistics of his termination.

Ciber contends that Marchizza's termination was not a unique

circumstance.  It had previously eliminated the positions of other area directors as a result of lost business with a primary customer or declining revenue.  If Hadzi had a declining account under his supervision, he tried to put in place cost saving measures, which would often be an account or project manager, to maintain the account instead of a more highly paid employee.  Ciber alleges this is demonstrated by the following examples:

> Hadzi decided to close down the Phoenix branch in 2009 due to the loss of business from American Express and a lack of other substantial clients in the Phoenix area.  Consequently, the AD/VP of that branch, Dan Hoglund (55), was terminated in December 2009 and an account manager was retained to maintain the account.  Thereafter, the remaining consultants of the Phoenix branch reported to Joe Mancuso.  Marchizza contends that, unlike the Springfield Branch, the Phoenix Branch lost all of its business.

> Similarly, Shane Davis (39), the AD/VP of Ciber's Memphis branch, was involuntarily terminated in April 2009 because his position was eliminated.  Hadzi decided to close down the Memphis office and eliminate Davis's position because the branch lost the FedEx business, a major account and the branch's largest customer, and there was a lack of subsequent growth in that area to replace it.  John Wood (42), the AD/VP of Ciber's Nashville branch, assumed the responsibility for the remaining Memphis consultants.  Marchizza disputes the allegation on the basis that Davis was terminated for performance deficiencies which involved more than the loss of

an account.

Carla Capps (46), the AD/VP of Ciber's Tallahassee branch, which was part of Ciber's State and Local Government Division, was also involuntarily terminated in March 2009 because her position was eliminated. Capps' position was eliminated by Burns because her branch was being shut down due to the reduction in the number of consultants that were managed by that branch. The remaining consultants from the Tallahassee branch reported to Richard Schulz (53) at the Orlando office. Marchizza disputes the allegation as to Capps, alleging that her territory was assigned to a younger area director.

Ron Noble's (61) position as the AD/VP of Ciber's NW Phoenix branch was eliminated when Ciber lost its business with Honeywell. When the Honeywell business left in December 2010, Noble went with it.

Before Jim Tatro (44), the AD/VP of Ciber's Chicago office resigned in June 2009, Ciber's Chicago office had lost some business with its primary customer, Axiom, and Tatro's position was going to be eliminated. The remaining consultants from the Chicago officer reported to Dan Hoover (55) of Ciber's Detroit branch.

Michael Halbert's (58) position as the AD/VP of Ciber's Atlanta branch was eliminated in July 2009 and his duties were transitioned to Regional Vice President, Tony Phillips.

*See* Ciber's Motion for Summary Judgment [Doc. No. 13], at 18-19 (internal citations omitted).

Margaret Goetze (50), the area director of the San Francisco Branch,

27

was also let go three days prior to Marchizza as part of the initial phase of the transformation of the Customs Solution Division. Based on the results of the San Francisco Branch, Ciber decided it no longer needed it in operation and proceeded with eliminating Goetze's position. Ciber received continuous complaints from customers about Goetze, and she was also unable to attract new clients and had significant turnover in sales staff that ultimately resulted in reduced revenues, gross profit and loss of clients.

After Marchizza's termination, Hadzi and Plisko "walked down the hall" and met with Ed Burns, Marchizza's former supervisor, to advise Burns (53) that he was terminated as well. During that meeting, Hadzi informed Burns of the plans for the transformation of Ciber's Customs Solution Division. Hadzi explained that there were cost efficiencies that could be achieved by regionalizing recruiting efforts, administrative functions that had previously been performed by each of the 36 branches. Burns agreed, stated he had similar thoughts and believed, conceptually, Hadzi's ideas would make Ciber more profitable. Burns and Hadzi also discussed the general concept of branches collapsing through the

reorganization process of becoming more efficient and positions being eliminated as they would become no longer necessary.

After his termination, Marchizza's responsibilities were transitioned to Steve Egart (53), the area director of Ciber's St. Louis Branch.  In addition, more than half of the Springfield/Bloomington Branch's staff was laid off in 2010 as the branch was transitioned into maintenance mode.  This meant that Ciber did not staff the Springfield/Bloomington Branch for growth and was able to reduce its administrative staff due to the consistently decreasing number of employees assigned to the State Farm account.  Eventually, in 2011, the physical branch office was closed and the few remaining employees worked from home.

Ciber alleges Marchizza has no evidence that his termination was discriminatory based on his age, an allegation which Marchizza disputes based on evidence gathered during discovery.  Ciber contends his allegations are based on his own personal beliefs and feelings that: (1) he was one of the oldest branch managers in his region at the time of his termination; (2) he was qualified to hold down several other jobs in the

organization if given the opportunity; (3) he was not retained, while younger people were; (4) his knowledge of when people "might have joined the company," as compared to when he started; and (5) his estimates as to others' ages.  Marchizza claims that the following area directors were younger than him at the time of his termination: (1) Tim Van Wyngarden; (2) John Wood; (3) Mark Hollingshead; (4) Goodney Zapp; (5) Dan Russell; (6) Todd Kerr; (7) Heather Morris-Kyer; (8) Dan Diefendorf; (9) Scott Youngman; (10) Tom Streicher; and (11) Dale Rinke.

Marchizza further testified that on one occasion in a three-day meeting in Denver in April 2010, he heard "rumors" that Hadzi said Marchizza was "one of those old guys that's not in touch with what the company's new direction is and [Hadzi didn't] think [Marchizza] was willing to change."  Marchizza admitted that he had no factual evidence that Hadzi did indeed make those statements.  It was "just hearsay" and he could not identify who told him about the "rumors."  Besides the purported "rumor," Marchizza neither heard Hadzi, nor any other management level Ciber employee, make any derogatory remarks concerning Marchizza's age.

30

F. Ciber's Custom Solutions Division after Marchizza's Termination

Effective January 1, 2011, Ciber's branch model fully collapsed and Ciber's regional model continued to come to fruition.  In January 2011, Mancuso became the Senior Vice President of Operations for Ciber's North American operations and was responsible for recruiting, consultant care and Ciber's administrative functions.  Mancuso's counterpart overseeing Ciber North America's sales operations was Bill Hazleton.  At the time Hadzi left Ciber in April 2011, the transformation of the Customs Solution Division was still in transition.

Ciber alleges only five of the 36 area directors it originally employed are still employed by Ciber and none still hold the area director title.  Those individuals are employed in the following capacities, with ages in parenthesis as of June 17, 2010: Mark Hollingshead (39), a Client Partner; Christine Locklin (58), a Sales Market Leader; John Morrisey (57), a Client Partner; Daniel Russell (49), a Sales Market Leader; and Timothy Van Wyngarden (42), a Sales Market Leader.  Marchizza alleges these facts are immaterial.

A client partner is the term Ciber transitioned to for identification of its sales personnel. Client partners report to a sales market leader who is responsible for managing the client partners and driving sales in a particular market. It was considered a demotion for an area director to assume a client partner role under the new model of the Customs Solution Division and the base salary was reduced accordingly.

Ciber identifies a list of twelve individuals, all but one of whom was over the age of 40 on June 17, 2010, who were involuntarily terminated due to elimination of their positions. One of the individuals was terminated approximately ten months after Marchizza. The others were terminated at least one year after Marchizza. Marchizza alleges these facts are immaterial because the identified individuals were terminated well after him. Moreover, Ciber has presented no evidence relating to the circumstances of the termination of each or the name of the individual who made the decision. Because Hadzi left Ciber well before most of the terminations, it does not appear he had any involvement in the employment decisions.

According to Ciber's Handbook, it was against Ciber's policy to

32

discriminate against someone because of his or her age.

## II. DISCUSSION

### A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the Plaintiff. *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. *See id*.

### B. Age Discrimination

In attempting to withstand summary judgment, a plaintiff in a discrimination case may proceed under the direct method or indirect method. *See Fleishman v. Continental Casualty Co.*, 698 F.3d 598, 603 (7th Cir. 2012).

(1) Direct Method

(A)

A plaintiff may meet his burden under the direct method by presenting direct evidence or circumstantial evidence. *See id*. A plaintiff may produce direct evidence, such as an admission by the employer, or circumstantial evidence that "points directly to a discriminatory reason for the employer's action." *See id*. (citations omitted). Marchizza does not allege that he has direct evidence of discrimination. A plaintiff seeking to create a genuine issue of material fact with circumstantial evidence "must connect the circumstantial evidence to the employment action such that a reasonable juror could infer the employer acted for discriminatory reasons." *Id*.

When proceeding with circumstantial evidence, to survive judgment

on his claims under the ADEA, Marchizza must produce "evidence from which an inference of discriminatory intent can be drawn, such as (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659-60 (7th Cir. 2013) (internal quotation marks omitted). A plaintiff may combine these different types of evidence to present a "convincing mosaic of circumstantial evidence" from which a reasonable inference of discrimination can be inferred by the fact-finder. *See id*. at 660. (internal quotation marks omitted). The "mosaic" language was not used to "promulgate a new standard;" a plaintiff need only present sufficient evidence from which a rational jury could infer that the employer terminated the plaintiff because he was a member of a protected class. *See Hanners v. Trent*, 674 F.3d 683, 692 (7th Cir. 2012). The evidence must point directly to a discriminatory reason for the

challenged action and relate directly to the employer's decision. *See Teruggi*, 709 F.3d at 660.

(B)

Marchizza contends there is substantial circumstantial evidence of age discrimination in connection with his termination.  Between April of 2009 and June of 2010, six area directors were discharged including Marchizza.  Four of the area directors were over the age of 50.  It appears at least five of the six were discharged by Hadzi.  The effective date of  Marchizza's termination, June 17, 2010,  was one month prior to his 52nd birthday. Margaret Goetze was terminated on June 15, 2010 when she was 50.  Dan Hoglund of the Phoenix branch was terminated effective December 4, 2009 when he was 55.  Michael Halbert of the Atlanta branch was terminated on July 27, 2009 when he was 58.  Shane Davis of the Memphis branch was terminated on April 27, 2009 when he was 39.  Carla Capps of the Tallahassee branch was terminated effective January 1, 2010 when she was 46.  In his declaration, Ed Burns states that Hadzi made the termination decision as to Capps.  Relying on the deposition testimony of David Plisko,

36

Ciber claims Capps was terminated by Burns, not Hadzi.  In addition to the six area directors, Burns was also terminated.  Burns, who is older than Marchizza, was terminated by Hadzi on the same day as Marchizza.

Shane Davis, the only one of the six area directors terminated between April of 2009 and June of 2010 who was under the age of 40, was a consistently poor performer.  Burns stated that he visited the Memphis branch frequently and attended meetings with Hadzi where the performance of the Memphis branch was discussed.  According to Burns, Hadzi and Anne Griffiths, Davis's immediate supervisor, would express displeasure with the performance of the Memphis branch at the meetings. Burns stated that he occasionally talked with Davis about the need on his part to reduce overhead and improve the profitability of his branch.  Davis was terminated because of his inability to reduce overhead and improve profitability.  Ciber emphasizes that Hadzi closed down the Memphis office and eliminated Davis's position because of the loss of business of FedEx. At the time Davis was terminated, there were 25 to 50 consultants working out of the Memphis branch, a substantial reduction which was due to the

loss of the major account.  Memphis once had over 100 consultants.

Carla Capps was the area director for the Tallahassee branch of the Division.  Relying on the declaration of Burns, Marchizza contends that before Capps was terminated by Ciber, it had removed several of her customers and reassigned them to Mark Hollingshead's Mississippi/Louisiana/Arkansas branch.  However, Ciber contends that in the months prior to Capps's termination, Ciber's headcount reports reveal not a single consultant being transferred from Capps's branch to Hollingshead's.  The decision to terminate Capps and assign her territory to the 39-year old Hollingshead was made by Tony Hadzi.  Burns stated that, in his position at Ciber, he worked on a regular basis with both Capps and Hollingshead.  Based on their respective performances as branch managers, Burns considered Capps to be a stronger manager than Hollingshead.[2]

_____

[2]Ciber contends many of the assertions in Ed Burns' affidavit should be stricken because they are argumentative, vague, self-serving, lack foundation and are conclusory.  Upon reviewing the affidavit, the Court disagrees.  Burns was in a supervisory position at Ciber and thus presumably is capable of evaluating employees with whom he worked.  To the extent that Ciber is suggesting that Burns's affidavit, which

Ciber notes David Plisko testified Burns told him that Capps was being terminated because the branch was being shut down due to the reduction in the number of consultants that were being managed by that branch. Moreover, at the time Capps was terminated, the Tallahassee Branch had two to three times less consultants than it had in the past.

Ciber states that, regardless of the reasons for shutting down the branch, it was in fact closed and Capps's position was eliminated. Ciber contends that Burns's opinion of Capps's performance, as compared to Hollingshead's, is irrelevant.

Marchizza alleges that, in the process of reorganizing the Division and assigning new positions to former area directors, Hadzi retained six area directors who were significantly younger than Marchizza. The oldest of them was nine years junior to Marchizza. The others ranged between ten and seventeen years younger than Marchizza. Marchizza contends that the performance of the branch headed by each of those younger area directors was significantly below the performance of the Springfield Branch.

_____

disputes some of Ciber's assertions, is self-serving because Ciber terminated him, Ciber cites no authority for that proposition.

Marchizza further asserts that Hadzi has identified no performance characteristics of any of these younger area directors explaining why he elected to retain them over Marchizza.

In June of 2010, the following individuals were area directors and were retained by Ciber at least during the initial part of the reorganization when Marchizza was terminated: (1) Heather Morris Kyer, the area director of the Boston branch, was 43 in June of 2010 and became a sales market leader following reorganization; (2) Tim Van Wyngarden (42), the Kansas City area director, became a market leader; (3) John Wood (42), the Nashville area director, became a client relationship manager; (4) Paul Cmiel (39), the Minneapolis area director, became a director of practice; (5) Mark Hollingshead (39), the Mississippi/Louisiana/Arkansas area director, became a client relationship manager; and (6) Dan Diefendorf (35), the New York area director, became a sales market leader. Although some of these individuals would later leave voluntarily or be terminated by Ciber, they were retained at the time Marchizza was discharged.

Ciber contends that the allegations concerning the performance of

other area directors as compared to Marchizza are immaterial because he is unable to show that the other alleged comparators are directly comparable in all material respects. The Court notes, however, that the inquiry cannot be too rigid. In at least one example, co-workers were deemed to be sufficiently similarly situated for proper comparison despite having different immediate supervisors, different job titles, and different duties. *See Coleman v. Donahue*, 667 F.3d 835, 847-52 (7th Cir. 2012). If almost identical comparators are required, the evidentiary requirement could become an "insurmountable hurdle." *See id.* at 852.

Ciber further asserts that the evaluation of who to retain in what positions throughout the reorganization of the Customs Solution Division was an ongoing process. Marchizza and Margaret Goetze were among the first area directors to be let go during the process. Several other area directors were later involuntarily terminated. Among the six individuals previously listed who were retained following the reorganization, only Hollingshead is still employed by Ciber, as a client partner, which is a significantly diminished role from that which he had as area director.

41

Morris-Kyer was terminated on April 22, 2011, while Diefendorf's position was eliminated on March 9, 2012, as part of the ongoing efforts to reorganize the CSD. Cmiel resigned in May of 2012.

In support of its argument that the reorganization was ongoing, Ciber points to twelve area directors who were involuntarily terminated after Marchizza due to the elimination of their positions. These terminations occurred well after Marchizza's—ranging from April 22, 2011 to October 2012. Moreover, Hadzi left Ciber on April 30, 2011, before all but the first of the twelve terminations. Because almost all of the twelve area directors were terminated by a different decision-maker and significantly later than Marchizza, this evidence is not particularly probative.

Except for one visit with State Farm in January 2010, Hadzi never visited the Springfield Branch. At no time during the State Farm visit was Hadzi critical in any respect about the manner in which the Springfield Branch had handled the State Farm account. Prior to the fall of 2009 Hadzi, because of the nature of his work for Ciber, had no involvement with Marchizza, the Springfield Branch or the State Farm work. At no time

did Burns ever tell Hadzi that Ciber had not attempted to sell solution work to State Farm. Ciber alleges that Hadzi's involvement or lack of involvement at this time is irrelevant because the relevant inquiry involves Marchizza's performance at the time of his termination in June 2010. Hadzi testified that he never spoke with Marchizza or any of the other area directors about their backgrounds.

Mancuso supervised Marchizza for less than six months beginning in January 2010. He never traveled to Springfield during that time or went into the field with Marchizza and had no direct communication with State Farm officials. Mancuso never criticized Marchizza concerning the sales performance of the Springfield Branch or any of the financial numbers generated by the Springfield Branch.

(C)

In the second quarter of 2010, the Springfield Branch had $8,736,000 in gross revenue. Its gross profit was over $2,363,000. After deducting its overhead, its net operating income that quarter was over $1,335,000. In the second quarter of June 2010, the Springfield Branch ranked second in

43

net operating income of all branches in the Division.  Although Mancuso labeled the performance of the Springfield branch as "terrible" at that time, Ciber's records show it compared favorably to some of the other branches, though it perhaps could be described as trending in the wrong direction.

The Springfield Branch's numbers were significantly better than those of the Kansas City Branch, whose area director was Tim Van Wyngarden. Marchizza, who was about nine years older, and Van Wyngarden  had the same supervisor.  In the second quarter of 2010, the Kansas City Branch generated $2,419,000 in gross revenue.  Its gross profit was $713,000. After deducting overhead, its net operating income was slightly more than $253,000.   All of these numbers ranked significantly lower than Marchizza's Springfield Branch.

The second quarter of 2010 coincided with the beginning of the reorganization.  During the initial part of the reorganization, Marchizza was terminated by Hadzi.  Van Wyngarden, who was supervised by Hadzi, became a market leader.

A number of other area directors were also retained and assigned to

other positions.  Heather Morris Kyer, the area director of the Boston Branch, was retained even though her branch was outperformed by the Springfield Branch in the second quarter of 2010.  John Wood, the area director of the Nashville Branch, was also retained even though his branch did not match the Springfield Branch's numbers.  Paul Cmiel, the area director of the Minneapolis Branch, was retained despite the fact that his branch's numbers were well below Marchizza's branch.  Mark Hollingshead, the area director of the Mississippi/Louisiana/Arkansas Branch, was retained even though his branch was outperformed by the Springfield Branch.  Dan Diefendorf, the New York Branch area director, was retained despite the fact that his branch's numbers did not match those of Marchizza's.

The aforementioned area directors were all younger than Marchizza, some by more than ten years.  According to the numbers, each of these area directors who was reassigned to another position led an office that was not as successful as Marchizza's.  In many cases, the other branches were not performing nearly as well as the Springfield Branch.

Based on the foregoing, the Court finds that Marchizza has presented

a "convincing mosaic of circumstantial evidence" such that a rational jury could infer that Ciber terminated him due to his age. It may be, as Ciber contends, that based on his skill set and the loss of the State Farm account, Marchizza would not have been a good fit for a position with the company after the reorganization. The younger employees who were retained may have been better equipped to succeed given the new direction of Ciber. Based on the numbers of the Springfield Branch and the other branches led by younger area directors, however, the Court concludes that there is a factual dispute on whether age was the real reason for Marchizza's termination.

## 2. Indirect method

Under the indirect method, Marchizza must produce evidence that (1) he is at least 40 years old; (2) he met Ciber's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated employee who was substantially younger. *See Tubergen v. St. Vincent Hosp. and Health Care Center, Inc.*, 517 F.3d 470, 475 (7th Cir. 2008). If the plaintiff meets his burden, the employer must

then produce a legitimate, non-discriminatory reason for the employment decision. *See Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 609 (7th Cir. 2012). The plaintiff must then show there is a factual issue as to whether the proffered reason is a pretext. *See id.* In a reorganization or reduction in force, the employer must provide its older employees with the same placement opportunities as it provided to younger employees. *See Tubergen*, 517 F.3d at 475. There is no dispute that Marchizza met the first and third elements of his prima facie case.

The parties dispute whether Marchizza met Ciber's legitimate expectations. Ciber claims Marchizza was not meeting its expectations, based on the loss of its preferred vendor status with State Farm and the "terrible" performance of the Springfield Branch according to Mancuso. The Court previously observed that because of the loss of most of State Farm's business, there is a basis for questioning whether the Springfield Branch was moving in the right direction. Based on the Springfield Branch's numbers compared to other branches, however, the Court finds there is a factual dispute on whether Marchizza was meeting Ciber's

47

legitimate expectations.

As for the fourth element, the Court concludes that the productivity of the various branches is the best tool to compare Marchizza's performance with that of other area directors. Marchizza and Tim Van Wyngarden had the same supervisor. Although the numbers suggest that the Springfield Branch was performing significantly better than the Kansas City Branch, Van Wyngarden was retained in another capacity at the time Marchizza was terminated. The two are about nine years apart.

As the Court previously stated, there were several other area directors who were more than ten years younger than Marchizza who Hadzi placed in other positions, even though their branches were not performing as well as the Springfield Branch. Although Ciber contends these individuals were better fits for the sales positions in the reorganized divisions because Marchizza's experience was in staffing, the record does not provide any basis for finding that the younger area directors were more qualified than Marchizza based on Ciber's explanation. Based on the foregoing, there is a genuine factual dispute as whether Marchizza was treated less favorably

48

than similarly situated employees who were substantially younger.

Ciber contends that it had legitimate, non-discriminatory reasons for the decision to terminate Marchizza.  It claims that the decision-maker, Hadzi and Mancuso, who concurred with Hadzi, honestly believed that there was no longer a need for Marchizza's position due to the impending reorganization of the Customs Solution Division, Ciber's declining business with the State Farm account, and the Springfield Branch's overall performance.

The Court concludes there are factual disputes regarding how Marchizza compared with other area directors who were retained following the reorganization.  There is little in the record to suggest that the other employees who were transitioned into new roles were better qualified than Marchizza for Ciber's transformed Customs Solution Division.

Marchizza has presented evidence tending to show that Hadzi and Mancuso had limited knowledge of his work and the Springfield Branch. Moreover, even as State Farm business was declining, the Springfield Branch was still outperforming many of the branches led by younger area

directors who Ciber retained as the reorganization began.

Additionally, although State Farm represented a significant percentage of business, that was not the Springfield Branch's only account.  In 2009 and 2010, the Springfield Branch did business with the State of Indiana, Cook County, Illinois, Bull HN Information Systems, Inc., Spherion, CQuest America, Inc., the Knowledge Services, the University of Illinois and others.  The Springfield Branch had a number of opportunities to obtain new work around the time Marchizza was terminated with the Chicago Housing Authority, the Illinois Toll Road Authority, and the Illinois Fire Marshal.

Following the reorganization, Ciber's sales/delivery/administrative model valued employees who fostered good relationships with customers and were adept at bringing in new accounts.  Marchizza notes there is no evidence that he had problems with any customer.  The Springfield Branch was active in bringing in new accounts and the Division's newsletter noted numerous times in 2010 about its proactive efforts in that regard.  Ciber points to no evidence suggesting that the younger area directors who were

retained were more proficient at fostering good relationships or at bringing in new accounts.  The only evidence is that these younger directors led branches that in most cases were significantly less profitable.

For these reasons, the Court concludes that there is a factual dispute regarding whether Ciber's asserted reason for terminating Marchizza is a pretext for a discriminatory reason.

## III. CONCLUSION

The Court concludes that whether Marchizza's age discrimination claims are considered under either the direct method or indirect method of proof, there are factual disputes which preclude the entry of summary judgment in Ciber's favor.

Ergo, the Motion of Defendant Ciber, Inc. [d/e 21] for Summary Judgment is DENIED.

ENTER: August 6, 2013

FOR THE COURT:

_s/Richard Mills_
s/Richard Mills
United States District Judge

51